**SWIFT RIVER COMPANY, INC.**

v.

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued Sept. 23, 1988.

Decided Nov. 8, 1988.

John C. Bannon (orally), Murray, Plumb & Murray, Portland, for appellant.

Phyllis Gardiner (orally), Asst. Atty. Gen., Augusta, for Bd. of Environmental Protection.

Linda Smith Dyer (orally), Dyer & Goodall, Augusta, for Friends of the Penobscot River.

Patrick J. Scully, Bernstein, Shur, Sawyer & Nelson, Portland, amicus curiae—Natural Resources Council of Maine.

Before McKUSICK, C.J. and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and HORNBY, JJ.

HORNBY, Justice.

This case requires us to interpret Maine's 1983 "Act to Promote the Wise Use and Management of Maine's Outstanding River Resources." P.L.1983, Ch. 458 § 1. We must determine the relationship between the provisions for "special protection for outstanding rivers" codified in the Maine Rivers Chapter, 12 M.R.S.A. §§ 401–406 (Supp.1987), and the provisions for licensing hydropower projects codified in the Maine Waterway Development and Conservation Act, 38 M.R.S.A. §§ 630–637 (Supp. 1987). We conclude that in balancing the variety of public and private interests in Maine rivers, the Legislature sought to encourage hydroelectric development generally, but specifically singled out a limited number of river and stream segments for a complete prohibition of any dam redevelopment that would diminish certain resource values in any way.

The Bangor Dam spans the Penobscot River at Treat's Falls between Bangor and Brewer approximately four miles downstream from Bangor Hydroelectric Company's Veazie Dam. It is located within a 32 mile stretch of the Penobscot River identi-

fied by the 1983 legislation as one of 18 "outstanding river and stream segments, meriting special protection." 12 M.R.S.A. § 403 (Supp.1987). The Bangor Dam has deteriorated over the years following its original construction in 1876. In particular, a sixty foot timber crib spillway failed in 1976 creating a 140 foot breach. This breach has allowed tidal influence to resume its natural range to Eddington Bend, approximately three miles upstream from the dam.

Under contract to the city of Bangor, Swift River Co. Inc. seeks to redevelop the dam for hydroelectric power. After extensive hearings on Swift River's application for a hydroelectric power permit, the Board of Environmental Protection voted to deny the permit. In denying Swift River's petition for reconsideration, it summarized its reasoning: the redevelopment "would diminish the significant anadromous fish resource value of the Penobscot River." (Anadromous fish are species that must swim upstream to spawn.) In particular, the Board found that "the project would diminish (1) current and future wild salmon production and survival, (2) future shad and alewive production and survival, (3) repeat salmon spawner survival, and (4) salmon angling opportunity." The Superior Court (Kennebec County; Alexander, J.) affirmed the Board's decision. We also affirm.

■ The statutory scheme here is plain. The 1983 legislation identified a variety of goals for use of Maine's 32,000 miles of rivers, including revitalization of waterfronts and ports, maintenance of scenic beauty, protection of the interests of riparian owners, increasing hydropower development, anadromous fisheries and recreation use. The last identified goal is to "protect the special resource value of the flowing waters and shorelands of the state's most outstanding river sections, as identified by the Department of Conservation 1982 Maine Rivers Study and as specifically delineated in this Chapter." 12 M.R.S.A. § 402 (Supp.1987). The Legislature found that all of these goals could be "reasonably integrated harmoniously" within the

State's vast river system. *Id.* In the Maine Waterway Development and Conservation Act it proceeded to centralize and simplify the permitting process for hydroelectric projects. 38 M.R.S.A. §§ 630–637 (Supp.1987). Section 636 of the Act sets forth a number of criteria for the Board to consider in the permitting process, including financial capability, safety, public benefits and environmental impact. But in the Maine Rivers Chapter, the Legislature singled out certain rivers "because of their unparalleled natural and recreational values" which, it declared, "provide irreplaceable social and economic benefits to the people in their *existing state.*" 12 M.R.S.A. § 403 (Supp.1987) (emphasis supplied). For these, the statutory criteria are plain and unadorned: there will be no new dams without specific authority of the Legislature; and no permit shall be issued for development or redevelopment of existing dams if it "diminishes the significant resource values of the river or stream segments." 12 M.R.S.A. § 403 (Supp.1987).

■ It is difficult to conceive of any clearer statement. The statute identifies the "significant resource values" as those set forth in the Department of Conservation's 1982 Maine Rivers Study. For this stretch of the Penobscot River those values include historic sites like Fort Knox, white water and flat water canoeing possibilities, wintering sites for bald eagles, rare or threatened plant species, and anadromous fish—specifically, the nation's largest salmon fishery, the highest priority salmon fishery in the State, and the most productive and intensively fished salmon pools in the Eastern United States. Swift River argues that the Legislature failed to provide articulable criteria and thereby delegated powers unconstitutionally to the Board of Environmental Protection in allowing it to determine whether a particular redevelopment "diminishes" significant resource values. We disagree. There is no ambiguity in the word "diminishes." It sets a standard, albeit a strict one, that is perfectly clear.

■ The Board denied Swift River's application because it concluded that redevel-

opment of the Bangor Dam would diminish the significant resource value of the anadromous fishery on this stretch of the Penobscot River. We find it necessary to deal only with the Board's findings concerning the current status of the fishery. It is true that Swift River went to great lengths to design a state of the art dam that would avoid interference with the salmon runs to the greatest degree possible and offered to replenish any losses by stocking. But it is simply undeniable that there was also evidence before the Board that the redevelopment of the dam would nevertheless diminish the current anadromous fish resource value to some degree. We therefore sustain the Board's decision. 5 M.R.S.A. § 11007(4) (1979).

The entry is:

JUDGMENT AFFIRMED.

All concurring.